**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ARCHIE L. WILLIAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-0559 |
| | § | |
| AT&T, INC., *et al.*, | § | |
| | § | |
| Defendants | § | |

**MEMORANDUM AND OPINION**

In this employment discrimination case, the plaintiff, Archie Williams, asserts

numerous claims against his former employer and his union arising from his firing. Williams

initially sued "AT&T Corp. formerly SBC/Southwestern Bell Telephone," Edward Whitacre,

Jr., the Chairman and CEO of AT&T, Inc., and Michael D. Tyson, Williams's former

supervisor. (Docket Entry No. 1). Williams alleged that he was fired after he had sought

various benefits after an on-the-job leg injury, including workers' compensation benefits,

leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., and

accommodation under the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12101 *et*

*seq*. Williams alleged that his firing resulted from discrimination and retaliation, in violation

of the Texas Workers' Compensation Act, the ADA, and the FMLA. This court previously

granted motions to dismiss the ADA claims against Tyson and all claims against Whitacre.

(Docket Entry No. 14). Because Williams did not assert a claim for retaliation in his EEOC

complaint, this court dismissed the retaliation claims under the ADA and FMLA against all

the defendants for failure to exhaust administrative remedies.  (*Id.*).  This court granted AT&T, Inc.'s motion for summary judgment on the basis that it was not a proper party because Williams's employer was, in fact, Southwestern Bell Telephone, L.P., now known as Southwestern Bell Telephone Company (SWBT).  (Docket Entry No. 26).  Williams was granted leave to amend to add SWBT as the proper defendant and did so.  (*Id.*).  Williams's remaining claims are that SWBT discriminated against him, in violation of the ADA; SWBT and Tyson discriminated against him, in violation of the FMLA; and SWBT and Tyson retaliated against him, in violation of the Texas Workers' Compensation Act.

In a separate action, *Williams v. The Communications Workers of America*, *et al*, Civ. A. No. H-08-0968, Williams sued SWBT and the Communications Workers of America, AFL-CIO ("CWA").  Williams alleged that his firing violated the Collective Bargaining Agreement ("CBA") between SWBT and CWA and that CWA breached its duty of fair representation.  Williams also alleged that his *Weingarten* rights were violated at a meeting held on June 27, 2006.  Williams's suit against SWBT and CWA was consolidated with this case on May 13, 2008.

SWBT, Tyson, and CWA have moved for summary judgment.  (Docket Entry Nos. 54, 30, 58).  SWBT and Tyson assert that Williams was fired because of a serious infraction of company rules and policy that followed a lengthy history of poor performance and violation of company policies.  This history began before Williams was injured or claimed any related benefits.  SWBT, Tyson, and CWA assert that Williams received the full range of warnings and progressive discipline before he was ultimately fired.  CWA moved for

2

summary judgment that it did not breach its duty of fair representation because its actions were neither arbitrary nor irrational.  Williams responded to the motions, (Docket Entry Nos. 32, 59).[1]  Williams asserts that SWBT and Tyson should have stopped the disciplinary process after he reported his leg injury and determined whether he needed an accommodation to perform his job duties.  Williams asserts that CWA failed to present his discrimination claims in the initial grievance and refused to arbitrate his claim after SWBT denied his grievance.  (Docket Entry No. 59).  SWBT and CWA replied, (Docket Entry Nos. 61, 62), and Williams filed a surreply, (Docket Entry No. 64).

Based on a careful review of the motions, responses, and replies, the parties' submissions, and the applicable law, this court grants the defendants' motions for summary judgment.  Williams's *Weingarten* claim is dismissed.  Final judgment is entered by separate order.  The reasons are explained below.

## I.    Background

### A.    The Summary Judgment Record

---

[1]  Williams filed a document titled "Plaintiff's Motion for Summary Judgment and Response to Defendant's Supporting Brief." (Docket Entry No. 59).  After reviewing Williams's motion with the liberal approach due *pro se* filings, this court considered this filing as "a response to the motions for summary judgment filed by SWBT and CWA, not as a cross-motion for summary judgment." (Docket Entry No. 60).  Williams argues that this court "erred by treating Plaintiff' Motion for Summary Judgement [sic] as a Response to Defendants' Motion for Summary Judgement [sic]." (Docket Entry No. 64).  Williams's objection is overruled.  In the filing, Williams made assertions that he was entitled to judgment as a matter of law but he did not present any basis that would have allowed such relief.  He did not "identify[] those portions of the record [he] believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  To the contrary, Williams's motion pointed to evidence he contended showed that the stated reasons for his job termination were pretextual.  Such evidence is generally asserted to raise fact issues precluding summary judgment, not to support the grant of summary judgment.

The summary judgment evidence in the record includes Williams's 2002, 2003, 2004, and 2005 performance evaluations, (Docket Entry No. 32, Ex. F);  an employee discussion log listing Tyson's conversations with Williams, (*id.*, Ex. I); Dr. Rabbani's June 29, 2006 report, (*id.*, Ex. H); e-mail correspondence between Tyson and the workers' compensation claims adjuster, (*id.*, Ex. K); Williams's recorded statement to the SWBT workers' compensation claims adjuster, (*id.*, Ex. E); the SWBT separation proposal for Williams, (*id.*, Ex. A); Williams's EEOC Charge of Discrimination, (Docket Entry No. 54, Ex. E); excerpts of Williams's testimony before the Texas Department of Insurance, Workers' Compensation Division, (*id.*, Ex. B); excerpts of Williams's July 14, 2008 deposition, (*id.*, Ex. C); and excerpts of Williams's October 14, 2008 deposition, (*id.*, Ex. D).[2]

---

[2]  SWBT and CWA object to the exhibits attached to Williams's response to the summary judgment motions. They argue that these exhibits are improper summary judgment evidence because all of the materials are unsworn.  The Fifth Circuit has held that "litigants, even if *pro se,* cannot oppose motions for summary judgment with unsworn statements." *Wilson v. Stalder,* 70 F.3d 1268, 1995 WL 696718, at *3 (5th Cir. 1995) (unpublished table decision) (citing *Gordon v. Watson,* 622 F.2d 120, 123 (5th Cir. 1980)).  Williams responds that his exhibits need not be sworn to because he included a verification statement that meets the requirements of 28 U.S.C. § 1746.

There are two statements essential to a proper verification under § 1746: (i) an assertion that the facts are true and correct; and (ii) an averment that the first assertion is made under penalty of perjury. *See Nissho-Iwai Am. Corp. v. Kline,* 845 F.2d 1300, 1306 (5th Cir. 1988).  Williams's filing states "I certify that on the 18th day of March, 2009 a true and correct copy of the above and foregoing instrument was served upon all counsel of record."  (Docket Entry No. 59, at 21).  But Williams submitted an amended motion that states, above his signature, "This statement is true and correct under the penalties of perjury 28 U.S.C. § 1746."  (Docket Entry No. 64).  Williams's verification statement is sufficient to meet the § 1746 exception for unsworn materials.  The defendants' objections to the exhibits on the basis that they are unsworn are overruled.

SWBT also specifically objects to Exhibits F, K, U, and Z on the basis that it was never served with these exhibits. And SWBT objects to Exhibits G, I, J, P, T, X, and Z1-Z14 on the grounds that they are inadmissible hearsay.  Out of an abundance of caution, this court reviewed these materials and is confident that their inclusion in the summary judgment record would not alter the decision.  Because these exhibits do not raise a fact issue precluding summary judgment, SWBT's objections to these exhibits are overruled as moot.

4

## B.      The Evidence in the Record

Williams began working for SWBT as a communications technician in August 1997. A communications technician works both in the field and in a central office. A technician's duties include making telephone connections on the main frame in the central office as well as troubleshooting and repairing telecommunications equipment in the field. The essential functions of a communications technician include moving and lifting material weighing up to seventy-five pounds; climbing ladders and poles, working aloft or in manholes, and working for extended periods in such positions as kneeling, stooping, crouching, and crawling. (Docket Entry No. 54, Ex. C, Williams Deposition, at 134:10-25). Tyson was Williams's supervisor between May 16, 2006 and July 11, 2006.

During Williams's employment, SWBT used a progressive employee discipline system in which the first step was a performance notice that outlined the employee's deficiencies. If the employee did not remedy the stated deficiencies, he would receive a written reminder. The final step was to place the employee on decision-making leave (DML). This was the employee's last opportunity to improve performance before being terminated. Under DML, the employee would be reminded of his performance problems, receive one day off with pay, and on returning to work decide whether to commit to improving the problems and continue working at SWBT.

Williams's performance evaluations for 2002, 2003, and 2004 rated his job performance as "Meets Expectations." (Docket Entry No. 32, Ex. F). On October 21, 2005, Williams received a performance notice from his supervisor, Malcolm Clark, notifying him

5

of deficiencies in his work performance, time reporting, and conduct.  Williams's 2005 performance evaluation rated his job performance as "Below Expectations."  (*Id.*).  On January 10, 2006, Clark placed Williams on DML for failing to improve.  On returning to work, Williams stated that he wished to continue working for SWBT.  Clark told Williams that he needed to achieve and sustain required performance levels in all aspects of his job to remain employed.  For purposes of his discipline record, Williams's "original Performance Notice in October 2005 was reduced to an employee discussion, and his Decision Making Leave (DML) was reduced to a Performance Notice in good faith along with additional training to provide Mr. Williams with multiple chances to improve and sustain an overall good measurement of work."  (Docket Entry No. 59, Ex. R).

Between January 2006 and July 2006, Williams continued to have performance, conduct, and time-keeping problems.  SWBT asserts that on March 15, 2006, Williams was again corrected for "problems associated with his work performance."  (Docket Entry No. 54, at 5).  On April 11, 2006, SWBT learned that Williams had worked unauthorized overtime and reminded him that he needed to obtain manager approval before working any overtime.  On April 18, 2006, a SWBT field technician complained to management that after waiting for two hours for Williams to wire a circuit, he called Williams, only to be put on hold for 20 minutes.  The technician had to call the test center directly to have them instruct Williams to wire the circuit.  SWBT asserts that Williams was not responsive to the technician's requests because "rather than perform his appointed tasks, [Williams] passed his work off to others, a process called 'poo'ing,' and he filled his day with self generated 'busy

work' which provided no value to [SWBT]."  (Docket Entry No. 54, at 5–6).  In his time report for April 18, 2006, Williams charged five and a half hours to "self-generated work."  (*Id.*).

On April 19, 2006, SWBT again admonished Williams for continuing to work unauthorized overtime.  Williams was told that he had sufficient time to complete his tasks, but that if he felt otherwise he could give his tasks to other employees who were not working overtime or ask management for help.  Williams was also admonished for his "continuing failure to meet his work performance measurements." (Docket Entry No. 54, at 6).  On April 24, 2006, several of Williams's coworkers complained to SWBT management about Williams's "work habits, perceived violations of the Code of Business Conduct involving time report handling, work hours, and excessive internet use, [his] unwillingness to properly manage his workload, his ineffectiveness in working with his peers, and his poor attendance." (*Id.*).  On May 11, 2006, SWBT management found "a number of discrepancies in Mr. Williams' time reports."  (*Id.*).

Tyson became Williams's supervisor on May 16, 2006.  On June 1, 2006, Tyson gave Williams a written notice of deficiencies in his work and included examples of poor performance.  The notice stated that Williams was failing to meet his workload expectations because he was spending several hours a day in self-generated work and not completing his assigned tasks.  The notice warned Williams that he could lose his job if he did not improve.  Tyson verbally instructed Williams that he should not stay in the office after his shift was over and that he needed to close out a work ticket once the project for that ticket was

7

completed.  Tyson told Williams that his failure to close out tickets timely was "causing [Williams] to miss critical reporting deadlines and resulting in unnecessary job escalation." (*Id.*).

On June 3, 2006, Williams "incorrectly charged two calls for 7 hours and missed his performance measurement on both calls."  (*Id.*, at 7).  Tyson again told Williams that he was not meeting his job expectations and that further problems would lead to more formal employee discipline.  On June 19, 2006, Williams did not report to work at his scheduled time.  He did not contact SWBT management to tell them he would not be at work, which was contrary to SWBT policy.  Williams subsequently told Tyson that he had missed work "because of weather issues."  (Docket Entry No. 54, Ex. A, Tyson Affidavit, at ¶ 18). Williams asserts that he "called his co-workers to let them know" he could not make it to work because of the weather.  (Docket Entry No. 32, at 9).  Williams asserts that he could not "get in touch with supervisor Michael Tyson" because Tyson "had just taken the job" and Williams did not have his contact information.  (*Id.*).

On June 27, 2006, Williams was placed on DML for deficient work performance and attendance.  Tyson met with Williams to discuss these issues.  A union steward from CWA was present at this meeting.  Tyson told Williams that his job was in jeopardy and asked why he was continuing to have performance problems.  Tyson also asked Williams if he could do anything to help him improve.  Williams responded that he "had not been trained on the frame."  (*Id.*, at ¶ 19).  Tyson subsequently checked Williams's training records and learned that he had been trained on the frame.  (*Id.*).  Williams did not say anything about a leg injury

8

or any injury that affected his ability to do his work.  Williams returned from this DML on June 29, 2006.

In this lawsuit, Williams alleges that he sprained his left leg on the job in 2006.  The record is unclear as to precisely when Williams's leg injury occurred and when he reported it to SWBT.  Williams has given a number of different dates at different times.  In the amended complaint, Williams alleged that he hurt his leg on March 6, 2006 and reported it to his then-manager, Daniel Todd, on March 23, 2006.  (Docket Entry No. 51).  Todd testified in Williams's workers' compensation proceeding that Williams told him on March 23, 2006 that he had suffered an on-the-job injury.  (Docket Entry No. 59, Ex. A, at 65:2–10).  Because Todd was not Williams's direct supervisor, he did not file a workers' compensation claim on Williams's behalf.  That responsibility fell on Malcolm Clark.  (*Id.*, at 65:2–6).

Williams submitted medical records showing that he went to an emergency room on May 8, 2006 for "chronic left leg pain."  (Docket Entry No. 59, Ex. P).  The doctor who saw Williams determined that his condition was not a medical emergency and referred him to his primary care physician.  (*Id.*).  The record shows that Williams saw Dr. Annigeri on May 9, 2006.  Williams told the doctor that he was "still experiencing pain to his left leg with a small amount of swelling to [left] side of leg" and that the "pain ha[d] not improved" since his last visit in April.  (*Id.*).  Dr. Annigeri prescribed ibuprofen.  (*Id.*).

In an interview with SWBT's workers' compensation claims adjuster, Williams stated that his injury occurred on June 20, 2006 at approximately 10:00 a.m.  (Docket Entry No. 32, Ex. E).  Williams also stated that he remembered that the injury occurred at "710 Berry Road,

9

Houston, Texas, 77021." (*Id.*).  In his EEOC complaint, Williams asserted that the leg injury occurred on June 7, 2006.  (Docket Entry No. 54, Ex. E).  When he appeared before the Workers' Compensation Division, Williams testified that the injury occurred in July 2006. (*Id.*, Ex. C., Williams Deposition, at 63:10-13).  In discovery responses in this lawsuit, Williams stated that the injury occurred on June 29, 2006.  (*Id.*, at 61:1-17).  In his deposition in this lawsuit, Williams acknowledged that he has given different dates and that he does not "know the injury date because [he] was trying to work through it."  (*Id.*, at 73:11-15).

With respect to when he reported the injury to SWBT, Williams alleged in his amended complaint that he first told Tyson on June 20, 2006.  (Docket Entry No. 51).  But Williams testified in his deposition that he first reported his injury to Tyson on June 29, 2006.  (Docket Entry No. 54, Ex C at 88:25-89:7).  That was the day Williams returned to work from the June 27, 2006 DML and the day he first visited a different doctor, Dr. Rabbani, about his leg injury.  (Docket Entry No. 32, Ex. H).  It is undisputed that the first time Williams mentioned a workers' compensation claim to Tyson was in June 2006.

Tyson and SWBT assert that Williams first mentioned his leg injury on June 29, 2006. (Docket Entry No. 54, Ex. A, Tyson Affidavit at ¶ 20).  Tyson testified in the workers' compensation proceeding that after he became Williams's supervisor on May 16, he learned that Williams had previously told Todd about the injury through an e-mail from Todd. (Docket Entry No. 59, Ex. A, at 86:12–16).  Tyson did not take any action because he assumed that it "had been taken care of" because the injury occurred before he became Williams's supervisor.  (*Id.*).  Tyson testified that Williams told him on June 29 that he had

sustained an on-the-job injury while he had an interim supervisor, sometime between March 23, 2006 and May 16, 2006.  Tyson also testified that Williams later told him that the injury date was June 7, 2006, but this date is inconsistent with records showing that Williams was not working on June 7 but instead was on vacation.  (Docket Entry No. 54, Ex. A, Tyson Affidavit at ¶ 20).  In response to Tyson's July 7, 2006 request for a written statement about his injury, Williams wrote that the injury occurred on June 20, 2006.  (Docket Entry No. 59, Ex. S).

It is undisputed that Williams visited Dr. Rabbani on June 29, 2006.  Williams told Dr. Rabbani that his injury had occurred on June 7, 2006 at 10:30 a.m.  (Docket Entry No. 32, Ex. H).  According to Williams, he was working on a ladder when his phone rang.  He began to climb down to answer the phone but underestimated the number of remaining rungs and stepped off the ladder when he was still several rungs from the ground.  Williams stepped off with his right foot while his left leg remained on the ladder.  This action "resulted in him suddenly overstretching his left thigh and groin muscles."  (*Id.*).  Dr. Rabbani diagnosed Williams with "acute traumatic sprain/strain of adductor muscles group" and "myospasms."  (*Id.*).  Dr. Rabbani recommended that Williams "refrain from climbing ladders to prevent further aggravation and promote healing."  (*Id.*).  Dr. Rabbani also recommended that Williams be placed on light duty for a "few weeks" while he had physical therapy.  (*Id.*).  Dr. Rabbani's prescribed therapy for Williams was massages, heating pads, riding an exercise bicycle, and walking on a treadmill.  (Docket Entry No. 54, Ex. C at 73:20–25).

11

Williams e-mailed Dr. Rabbani's report and a workers' compensation request form to Tyson on July 4, 2006. Tyson was out of the office that day due to the holiday and received the e-mail and report on July 5. He responded to Williams that the medical report should be sent to SWBT's disability group and that "it was not [his] place to review or analyze Mr. Williams' private health records, as I am not qualified to make medical decisions." (Docket Entry No. 54, Ex. A, Tyson Affidavit, at ¶ 21). Williams subsequently sent Dr. Rabbani's report to the disability group.

On July 5 and July 6, 2006, Williams again worked unauthorized overtime. SWBT asserts that despite the additional time, Williams did not complete his assigned tasks for July 6. According to SWBT, Williams "continued his pattern of failing to fulfill his assigned tasks while filling his time with self-generated work." (Docket Entry No. 54, at 7). Williams acknowledged in his deposition that he worked unauthorized overtime on these dates despite the warnings Tyson had given him that doing so could mean losing his job. (Docket Entry No. 54, Ex. D at 32:12-17). On July 7, 2006, Tyson gave Williams a final warning that SWBT would no longer tolerate his poor performance, unauthorized overtime, or failure to complete tasks because he was doing self-generated work. Tyson told Williams that the next step of employee discipline would be termination. Williams asserts that he requested an accommodation for his injury and FMLA leave on July 7, 2006. (Docket Entry No. 32, at 8).

On July 10, 2006, Williams violated company policy, resulting in the loss of a school district's telecommunication services for nearly 24 hours. Williams was working on a

12

"rearrangement job" for the school district.  A rearrangement job involves disconnecting and reconfiguring a customer's telecommunications service.  The job requires a number of technicians working in coordination from different locations to ensure that the customer does not lose service.  Once the disconnection occurs, the reconfiguration is supposed to happen immediately to minimize the amount of time without service.  On July 10, Williams began his part of the rearrangement job ahead of schedule, without authorization or instruction.  He disconnected the school district's telephone service and subsequently closed out the ticket for that project without ensuring that the district's service had been reconnected.  Williams did not tell anyone that he had disconnected the service.  As a result, the school district did not have telephone service for about 24 hours.  These actions were in violation of SWBT policy and below the required performance standard for a communications technician.

The next day, July 11, Tyson learned what Williams had done and suspended him for violating company policy and the terms of his June 27, 2006 DML.  Williams returned to Dr. Rabbani the next day, July 12, 2006.  Williams told Dr. Rabbani that he "thought the treatment [Dr. Rabbani] was giving was not helping [him] because it just didn't see[m] like that was the proper treatment."  (Docket Entry No. 54, Ex. B at 25:7–9).  After Williams told Dr. Rabbani that the therapy treatments were not helping, Dr. Rabbani referred Williams to a chiropractor, Dr. Thompson, for X-rays to "[r]ule out [a] fracture," (*id.*, at 25:10–11; Docket Entry No. 59, Ex. P), and restricted Williams from all work pending the results. (Docket Entry No. 54, Ex. B at 25:12-16).  On July 19, 2006, Williams visited Dr. Thompson and had X-rays taken of his left hip and pelvis.  (Docket Entry No. 59, Ex. P).  Dr. Thompson

13

reviewed the X-rays and found: "The pelvis is symmetrical.  No acetabular dysplasia is identified.  Joint spacing is within expected limits.  Cortical margins and trabecular patterns are intact.  Soft tissues are within expected limits." (*Id.*).  Dr. Thompson concluded that the X-rays were "negative for fracture or other focal acute bony abnormality." (*Id.*).

After Williams was suspended for violating company policy, SWBT's disability and workers' compensation carrier denied Williams's claim because he had provided multiple dates "as the date of the injury with the same mechanism of injury. Claimant failed to timely report an injury within 30 days of the injury." (Docket Entry No. 32, Ex. K).  The carrier also disputed that Williams suffered from a disability. (*Id.*).

Williams was on suspension from work until August 7, 2006, when SWBT decided to terminate his employment.  SWBT asserts that Williams was fired for "his continued unsatisfactory job performance, poor attendance, the morale problems his misconduct caused in the work group [,] and outright insubordination in his failure to follow directions despite being told repeatedly that his job was in jeopardy." (Docket Entry No. 54, at 9).  Williams asserts that his employment was terminated because of his leg injury and his workers' compensation claim.  Williams asserts that although he had "performance" problems, he did not have "misconduct" problems, and that the defendants have "tainted" the record with this evidence. (Docket Entry No. 32, at 7).  Williams asserts that "the stated reasons for [his] discharge [are] false because [he] was discharged for poor job performance and not misconduct, attendance or insubordination." (Docket Entry No. 59, at 4).  And, according to Williams, his poor job performance was caused by his leg injury and could have been

14

remedied by "accommodation of work restrictions or light duty," which he alleges the defendants failed to provide.  (*Id.*).  However, Williams acknowledges that his performance problems began before his leg injury, using the earliest possible injury date the record supports.  Williams received a poor-performance notice in October 2005, a DML in January 2006, another performance notice on June 1, 2006, a warning about his performance on June 3, 2006, another DML on June 27, 2006, and a suspension on July 11, 2006.  Williams asserts that after he reported his injury, the disciplinary process should have stopped.  At that point, he asserts that SWBT "should have sat down and talked to [him] about the injury." (Docket Entry No. 54, Ex. C at 119:19–25).

It is undisputed that Williams had performance problems before his injury.  It is also undisputed that Williams did not refer to his leg injury when SWBT supervisors talked to him about his continuing performance problems before July 11, 2006.  Williams did not state that his leg injury was the cause of his inability to meet job expectations.  Williams has testified that he did not believe he had any performance problems.  In the Texas Workers' Compensation proceeding, Williams testified that he was placed on DML on January 10, 2006 "for misconduct" and not for "performance problems."  (Docket Entry No. 54, Ex. B at 37:6-12).  Williams testified that he "didn't have any performance problems up to that time" and that the DML was based on "mostly misconduct and stuff like that."  (*Id.*, at 37:11-15).  In his deposition, Williams testified that when Tyson gave him a performance notice on June 1, 2006, he "didn't really think [he] had a performance problem."  (Docket Entry No. 54, Ex. C at 103:19-25).  According to Williams, he received the performance notice because

15

of "a disagreement about what things were going on" and not because of poor work. Williams testified that he "didn't think he had a performance problem." (*Id.*, at 104:1-8). But later in his deposition, Williams testified that he "had performance problems, but that's not why [he] got fired." (*Id.*, at 125:11-18). He testified that although he had performance problems beginning in October 2005, he was fired in "[r]etaliation for trying to get off on Workman's Comp before they give me the disciplinary action to get off the clock so I can stop suffering from a performance problem." (*Id.*, at 125:19-126:9). SWBT and Tyson assert that Williams acknowledged his performance problems in this lawsuit after denying them during the prolonged progressive discipline process because "he *needs* to have been physically impaired" to succeed on his ADA claims. (Docket Entry No. 54, at 11).

SWBT and Tyson deny that Williams gave them any indication of physical problems that interfered with his ability to do his work within the regular work day or that required accommodation. Tyson stated in his affidavit that "although [he] saw [Williams] perform a host of tasks, [he] never observed anything that made [him] believe [Williams] was physically unable to perform the essential functions of his job." (Docket Entry No. 54, Ex. A, Tyson Affidavit at ¶ 23). Between May 16, 2006 and July 10, 2006, Tyson observed Williams "walk, move, lift things, climb ladders and generally perform his job." (*Id.*). According to Tyson, Williams "never seemed physically unable to perform his work." (*Id.*).

On July 17, 2006, CWA filed a grievance on Williams's behalf from the July 11 "Suspension and/or Termination . . . without just cause . . . ." (Docket Entry No. 58, Ex. B-4). The grievance went through the process outlined in the CBA between SWBT and CWA.

16

On January 5, 2007, SWBT denied the grievance.  (*Id.*, Ex. B-5).  The CWA staff representative assigned to Williams's case, Gloria Parra, informed Williams of SWBT's decision on January 10, 2007.  (*Id.*, Ex. B-6)  Parra explained to Williams that she disagreed with SWBT's decision but was unable to recommend continued pursuit to arbitration because SWBT had "followed progressive disciplinary action" and fired Williams for "continued infractions."  (*Id.*).  She explained that "[i]t would be difficult to prevail before an arbitrator given the work and disciplinary history in your record."  (*Id.*).  Williams appealed Parra's decision not to arbitrate by letter dated January 31, 2007.  (*Id.*, Ex. B-7).  He argued that SWBT had violated Article IX of the CBA, entitled "Nondiscrimination," because firing him violated the ADA, FMLA, and Texas Workers' Compensation Act.  (*Id.*).  Williams contended that CWA had "an obligation to take this to arbitration" to "get the Company to fully comply with" these laws.  (*Id.*).  He also argued that the record was "tainted and prejudicial" because it included "charges that were dropped but were used to make the discharge decision."  (*Id.*).

Williams's appeal was forwarded to the District 6 Arbitration Review Panel, which "serves as a fact-finding body that reviews all grievances that are appealed to arbitration and presents the facts of the case and a recommendation on whether to arbitrate the case to District 6 Vice President Andy Milburn."  (Docket Entry No. 58, Ex. B, Affidavit of Ed Pinkelman, at ¶ 2).  District 6 includes Texas, Oklahoma, Arkansas, Missouri, and Kansas. (*Id.*, at ¶ 1).  Vice-President Milburn serves as the Chair of the Arbitration Review Panel and "ultimately decides whether a grievance will be arbitrated."  (*Id.*, at ¶ 2).  On April 2, 2007,

17

after reviewing Williams's grievance file and appeal letter, the Arbitration Review Panel and Milburn decided not to recommend the case to arbitration because "it is most unlikely that an arbitrator would sustain the grievance based on the grievant's progressive disciplinary record, including being on an active DML, and documentation regarding previous discussions with him on performance problems."  (Docket Entry No. 58, Ex. B-8).

Williams appealed the Arbitration Review Panel's decision to CWA President Larry Cohen by letter dated April 20, 2007.  (*Id.*, Ex. B-9).  Williams made the same arguments to Cohen as he had to the Arbitration Review Panel.  (*Id.*).  On May 31, 2007, Cohen upheld the decision not to arbitrate.  (*Id.*, Ex. B-10).  In his letter, Cohen laid out Williams's disciplinary history and performance problems as the basis for upholding the Arbitration Review Panel's decision.  (*Id.*).  In response to Williams's allegations that SWBT had violated the ADA and the FMLA, Cohen explained that "the record does not contain, and you have not submitted to me, evidence substantial enough to convince me that CWA could successfully argue that the company violated these laws when it discharged you." (*Id.*).  On June 25, 2007, Williams exercised the last step in the internal appeal process and appealed Cohen's decision to CWA's Executive Board.  (*Id.*, Ex. B-11).  On October 2, 2007, the Executive Board upheld Cohen's decision not to arbitrate Williams's grievance.  ( *Id.*, Ex. B-12).

According to Williams, his leg sprain did not heal until September 2007.  (Docket Entry No. 54, Ex. C at 25:25–26:5).  Williams has not worked since he was fired by SWBT.  Williams testified that he could have worked between July 2006 and September 2007, even

though he still had his leg sprain, but "it would be under certain kind of conditions," like a "sitting down position." (*Id.*, at 26:17–25).  Williams testified that he did not apply for "those type of jobs." (*Id.*, at 29:10–14).  He has been receiving Social Security disability payments since September 2007. (*Id.*, at 30:13–16).  Since he was fired, Williams has also developed "diabetic foot ulcers" unrelated to any work injury. (*Id.*, at 23:10–15).  In July 2006, Williams developed ulcers on his right foot that were caused by "tight shoes" he wore while on his June 2006 vacation. (*Id.*, at 22:1–6).  In March 2008, Williams developed ulcers on his left foot as the result of an infection. (*Id.*, at 22:7–19).  The ulcers have impaired Williams's mobility and caused him to walk with a limp. (*Id.*, at 23:16–25).

On August 21, 2006, Williams filed a Charge of Discrimination with the EEOC, alleging disability discrimination. (Docket Entry No. 54, Ex. E).  Williams alleged that he "sustained an injury on the job" on June 7, 2006 and that Tyson was "aware of [his] injury" and "e-mailed [him] and management that [his] injury should go under 'disability.'" (*Id.*).  He further alleged:

> On July 6, 2006, Mr. Tyson approached me and asked me why I was still at work.  He knew that I was recovering from my injury and I was trying my best to complete the job.  On July 11, 2006, I was suspended from my job, pending dismissal.
>
> On July 11, 2006 I was suspended for working not completing a fiber run or jumper on the fiber frame using a ladder.
>
> I believe that I am being regarded as an individual with a disability, in violation of the Americans with Disabilities Act of 1990.

19

(*Id.*).  On November 14, 2006, the EEOC issued a "Dismissal and Notice of Rights," explaining that, based on its investigation, the EEOC was "unable to conclude that the information obtained establishes violations of the statutes."  (Docket Entry No. 1, Ex. A). The EEOC notified Williams of his right to sue.  (*Id.*).  Williams filed this lawsuit on February 9, 2007.  (Docket Entry No. 1).

Williams is proceeding *pro se*.  Courts apply "less stringent standards to parties proceeding *pro se* than to parties represented by counsel and liberally construe the briefs of pro se litigants." *Sanders v. Barnhart*, 105 Fed. Appx. 535, 536 (5th Cir. 2004) (citing *Grant v. Cuellari*, 59 F.3d 523, 524 (5th Cir. 1995); *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993)).

The motions, responses, and replies related to Williams's remaining claims are addressed below.

## II.      The Legal Standard For Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.

While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "'An issue is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 (citation omitted). "Rule 56(c) mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.   Analysis

### A.   The ADA Claims[3]

In his EEOC charge, Williams alleged that SWBT discriminated against him, in violation of the ADA, because he "believe[d] that [he was] being regarded as an individual with a disability." (Docket Entry No. 54, Ex. E). Williams also alleged that SWBT denied him a reasonable accommodation that would have allowed him to fulfill his essential job functions. In his amended complaint, Williams alleged that he had a disability that required accommodation because his leg injury "limited his ability to walk, stand, kneel, squat, push, pull, work, and climb." (Docket Entry No. 51, Amended Complaint). Williams also alleged that SWBT interfered with his ADA rights "by not engaging in the 'interactive process' and by not following its own policies on ADA or not having in place a policy that is in complies [sic] with the ADA federal law and regulations." (Docket Entry No. 59, at 3). SWBT argues that the record does not support any inference that Williams was either disabled or regarded as disabled and that, as a matter of law, no ADA violation occurred. (Docket Entry No. 54, at 11–13).[4]

---

[3]  Because the ADA claims against Tyson have been dismissed, this section only analyzes SWBT's liability.

[4]  SWBT also argues that the scope of this lawsuit is limited to Williams's "regarded as" claim because he alleged "regarded as" in the EEOC charge and did not allege actual disability. A plaintiff must administratively exhaust his claims before filing suit. The scope of a lawsuit is limited to the scope of the

"As a threshold requirement in an ADA claim, the plaintiff must . . . establish that he has a disability." *Rogers v. Int'l Marine Terminals*, 87 F.3d 755, 758 (5th Cir. 1996). The ADA defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more major life activities"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2). "A plaintiff cannot assert that his employer is required to make reasonable accommodations to his physical or mental limitation until he satisfies the test for disability discrimination." *Lindsey v. Chevron USA Inc.*, No. 02-60056, 2002 WL 31415255, at *4 (5th Cir. Oct. 10, 2002).[5]

---

EEOC investigation that can reasonably be expected to grow out of the EEOC claim. *See Randel v. U. S. Dep't of the Navy*, 157 F.3d 392, 395 (5th Cir. 1998). The ADA definition of disability includes both "a physical or mental impairment that substantially limits one or more life activities" and "being regarded as having such an impairment." 42 U.S.C. § 12102(2). Williams checked the box for "disability" on the EEOC charge. An EEOC investigation into a claim based on actual disability can reasonably be expected to grow out of Williams's charge. *Cf. Anderson v. Foster Group,* 521 F.Supp.2d 758, 786 (N.D.Ill.2007) (holding that "regarded as" claim was reasonably related to claim of discrimination on the basis of disability); *Smith v. Warren R. Gregory & Sons, Inc.,* No. IP99-1490-C-B/S, 2001 WL 1691640, at *5–6 (S.D. Ind. Nov. 21, 2001) (allowing plaintiff to argue that employer "regarded [him] as disabled" despite "bare-bones" EEOC charge because allegation in EEOC charge that plaintiff had been treated unfavorably based on disability triggered inquiry into various definitions of disabled, including the "regarded as" definition); *but see Silva v. Chertoff*, 512 F.Supp.2d 792, 819–20 (W.D.Tex. 2007) (holding that plaintiff did not exhaust "regarded as" claim where EEOC charge alleged discrimination on the basis of actual disability). SWBT's objection is overruled.

[5]   Williams argues that he does not have to prove that he was disabled or regarded as being disabled to succeed on his ADA claims. (Docket Entry No. 59, at 16). Williams contends that his requests for an accommodation "should have triggered the interactive process," which would have allowed SWBT to determine if his injury was a disability that required accommodation. Williams argues that SWBT violated the ADA because its failure to engage in the interactive process led to "a failure to reasonably accommodate an employee." (*Id.*). This argument is unpersuasive. The law is clear that an ADA plaintiff must establish that he has a disability or was regarded as having a disability, even if the plaintiff alleges a failure to engage in the interactive process. If there is no disability, then the employer's action or inaction could not lead to a "failure to reasonably accommodate an employee" because there is nothing to accommodate.
     Williams's alternative argument that he meets all three prongs of the disability definition because "the box marked Discrimination Based on Disability" was checked on his EEOC Charge of Discrimination is similarly unpersuasive. The fact that an aggrieved employee checked a box or even alleged that he was disabled does not establish that he was disabled within the meaning of the ADA.

23

### 1.    Actual Disability

In this lawsuit, Williams claims that he was disabled because his left leg injury "limited his ability to walk, stand, kneel, squat, push, pull, work and climb." (Docket Entry No. 51, at 5). Williams argues that Dr. Rabbani's June 29, 2006 report restricted him from using a ladder and required him to be placed on light duty for a few weeks. SWBT asserts that Williams was not disabled under the ADA because he was not substantially limited in performing a major life activity. (Docket Entry No. 54, at 12–13).

"Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). To be disabled requires more: "an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 198. The impairment must have an impact that is "permanent or long term." *Id.*; *see also Hinojosa v. Jostens Inc.*, 128 Fed. Appx. 364, 368 (5th Cir. 2005). "The term 'disability' does not include temporary medical conditions, even if those conditions require extended leaves of absence from work." *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199 (4th Cir. 1997) (citation omitted), *abrogated on other grounds by Baird ex. rel. Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999). A plaintiff "must prove that he was disabled at the time of the alleged discriminatory act." *Lottinger v. Shell Oil Co.*, 143 F. Supp. 2d 743, 761 (S.D. Tex. 2001).

"Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995) (quoting 29 C.F.R. § 1630.2(I)).

24

"Other major life activities could include lifting, reaching, sitting, or standing."  *Id.* at 726 n.7.  A plaintiff "must also show that the limitation on the major life activity is substantial."  *Hinojosa*, 128 Fed. Appx. at 366.  "Disability" requires a plaintiff to be "*prevented* or even *severely restricted* from performing" the activities of "daily living."  *Id.* at 367.  "The central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives," rather than on "the impairment's effect in the workplace."  *Toyota*, 534 U.S. at 185.

Williams has not raised a fact issue as to whether his leg sprain substantially limited him from engaging in activities of central importance to daily life.  Setting aside the evidence that Williams did not tell his supervisors that his leg sprain was interfering with his ability to do his work or that he needed accommodation, and taking the evidence in the light most favorable to Williams, leads to the conclusion that he is not disabled under the ADA, as a matter of law.

Williams does not contend that his leg injury substantially limited him from the major life activity of working.  Williams testified in his deposition that after his leg sprain and continuing through the date he was fired, he was able to drive, see, read, hear, reproduce, type, do manual tasks, and bathe, clothe, and feed himself.  (Docket Entry No. 54, Ex. C at 90:9–91:19).  When asked if he was able to walk in July 2006, he responded, "Yes, but with a limp. But I was able to walk, yeah."  (*Id.*, at 90:14–16).  Williams also testified that "[b]ecause of so much pain that I couldn't walk as fast, I couldn't get around the office that

much." (*Id.*, at 142:24–25). An actionable impairment must be substantially limiting; some difficulty in walking does not rise to the required level of severity. *See Talk v. Delta Airlines*, *Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999) (holding that a leg deformity that caused moderate difficulty in walking and a limp that resulted in walking at a "significantly slower pace than the average person" was not a substantial impairment under the ADA). Williams testified that he was limited in his ability to squat, kneel, push, pull, and climb a ladder, but this did not prevent or severely restrict him from engaging in major life activities. *See Coats v. Goodyear Tire & Rubber Co.*, No. 02-21286, 2003 WL 21145732, at *1 (5th Cir. Apr. 30, 2003) (holding that restrictions on lifting, pushing, and pulling did not restrict plaintiff from engaging in activities of central importance to daily life); *Rogers*, 87 F.3d at 758 n.2 (holding that restriction on climbing stairs did not substantially limit a major life activity). Williams testified in his deposition that his left leg sprain healed in September 2007 because he "stopped feeling pain in that area." (Docket Entry No. 54, Ex. C at 25:4-11; 25:25-26:9). Courts have held that temporary conditions that heal do not constitute a disability as defined by the ADA. *Rogers*, 87 F.3d at 758 (holding that temporary and surgically correctable ankle problems did not substantially limit the major life activities of standing, walking, and working and did not constitute a disability within the meaning of the ADA); *Martin v. AIMCO Properties*, *L.P.*, 2002 WL 1575411, at *2 (N.D. Tex. Jul. 16, 2002) (holding that "a mild limp brought about by residual leg weakness, which inhibited" plaintiff's ability to "walk long distances or long periods of time" and to "go up and down stairs for long periods of time" was not a disability under the ADA). It is clear that a temporary disability does not

meet the standards of the ADA; rather, "[t]he impairment's impact must . . . be permanent or long term." *See Toyota*, 534 U.S. at 198 (citing 29 CFR §§ 1630.2(j)(2)(ii)-(iii)).

Williams's own testimony shows that his left leg sprain was not a disability under the ADA.   He can only satisfy the threshold requirement for his ADA claims if the evidence supports an inference that he was "regarded as" having a disability.

## 2.    Perceived Disability

Under the ADA, a plaintiff is "regarded as" disabled if he: "(1) has an impairment which is not substantially limiting but which the employer perceives as . . . substantially limiting . . . ; (2) has an impairment which is substantially limiting only because of the attitudes of others towards such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment." *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 475 (5th Cir. 2006).   The employer "must entertain some misperception regarding the individual – either that he has a substantially limiting impairment that he does not have or the impairment is not so limiting as believed." *Aldrup v. Caldera*, 274 F.3d 282, 287 (5th Cir. 2001).   If the employer excludes the employee from a broad range of jobs, the employee is "regarded as" disabled under the ADA. *Blanks v. Sw. Bell Commc'ns, Inc.*, 310 F.3d 398, 401 (5th Cir. 2002).   On the other hand, if the employee is merely barred from a narrow range of duties, then he or she is not "regarded as" disabled under the ADA. *Id.*

The record does not raise a disputed fact issue material to determining whether Williams was "regarded as" disabled.  There is no evidence that Tyson or anyone at SWBT perceived Williams as disabled.[6]  Nor is there any evidence that SWBT excluded Williams from a broad range of jobs because of any perceived disability.  Tyson stated in his affidavit that he saw Williams "walk, move, lift things, climb ladders and generally perform his job." (Docket Entry No. 54, Ex. A, Tyson Affidavit at ¶ 23).  Tyson "never observed anything that made [him] believe [Williams] was physically unable to perform the essential functions of his job."  (*Id.*).  Williams himself testified that SWBT fired him because "they think I was trying to get off the clock to save my job" because "they think I wasn't injured."  (Docket Entry No. 54, Ex. D at 108:17–19).  Williams testified:

> Q:   Do you contend that what Mr. Tyson, and therefore, the company did wrong, was that it did not believe you when you said that you were injured?
>
> A:   I would think so.  I would think so.  Because that's the only conclusion I can come to.

(*Id.*, at 108:23–109:2).  The evidence in the record does not permit a conclusion that SWBT regarded Williams as having a disability.

---

[6]   The only statement that can possibly be construed as evidence that SWBT regarded Williams as having a disability is Tyson's July 5, 2006 e-mail in response to Williams's workers' compensation claim and attached doctor's report.  Tyson advised Williams that this information should be sent to the "disability group."  (Docket Entry No. 59, Ex. C).  The group that examined Williams's workers' compensation claim is called the "AT&T Integrated Disability Service Center."  (*Id.*, Ex. G).  It handles disability claims, workers' compensation, and job accommodation.  (*Id.*, Ex. H).  The fact that Tyson referred to this group as "the disability group" is insufficient to raise a fact issue as to whether SWBT regarded Williams as disabled.

Because Williams cannot raise a fact issue as to whether he was disabled or regarded as disabled under the ADA, SWBT's motion for summary judgment on Williams's ADA claims is granted.

### B.    The FMLA Claims[7]

Williams alleged that SWBT violated the FMLA by denying his July 7, 2006 leave request.  Williams alleged that he "suffered a type of job related injury that is also a serious health condition that made [him] unable to perform his job."  (Docket Entry No. 51, at 5).  Williams argues that SWBT interfered with his FMLA rights "by not engaging in the 'informal process'" and by failing to give him "a copy of the FMLA1 and FMLA2 forms along with the Notice of Eligible and Rights and Responsibilities" after he requested FMLA leave.  (Docket Entry No. 59, at 18).  SWBT moves for summary judgment on the FMLA claim, arguing that the evidence shows that Williams did not suffer from a serious health condition and did not qualify for an FMLA leave.  (Docket Entry No. 54, at 16–17).

Under the FMLA, an eligible employee is entitled to 12 work weeks of leave in a 12-month period because of, among other things, a "serious health condition" that results in the employee's inability to perform his job requirements.  29 U.S.C. § 2612(a).  The employer may require an employee to support a request for FMLA leave with a certification from a health care provider that includes information about when the serious health condition began, the probable duration of the condition, and the medical information known to the health care

---

[7]   The FMLA retaliation claims have previously been dismissed, (*see* Docket Entry No. 14).

provider about the situation.  29 U.S.C. § 2613(a), (b).  An eligible employee who takes FMLA leave is entitled, upon returning from leave, to be restored to his original position or to an equivalent position.  29 U.S.C. § 2614.

The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11).  The regulations under the FMLA define a "serious health condition involving continuing treatment by a health care provider" as including:

> (1) a period of incapacity (i.e., inability to work . . .) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>> (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2).  "Treatment" is defined to include "examinations to determine if a serious health condition exists and evaluations of the condition."  29 C.F.R. § 825.114(b). In *Murray v. Red Kap*, 124 F.3d 695 (1997), the Fifth Circuit explained that "under the regulation, where an employee alleges that he has a serious health condition involving continuing treatment by a health care provider, he must first demonstrate a period of incapacity (i.e., the inability to work) for at least four consecutive days.  Next, he must show that he received subsequent treatment or had a period of incapacity, in which he was seen at

least two times by a health care provider (or a qualified provider of health care services) or obtained a regimen of continuing treatment under the supervision of a health care provider." *Id.* at 698.

Whether an employee has a "serious health condition" is determined objectively, not subjectively, under the criteria outlined in § 825.114(a).  *See Russell v. North Broward Hosp.*, 346 F.3d 1335, 1345 (11th Cir. 2003) ("[T]he regulatory objective test for 'serious health condition' . . . avoids the need for employers – and ultimately courts – to make subjective decisions about statutory 'serious health conditions . . . .'") (citing *Thorson v. Gemini, Inc.*, 205 F.3d 370, 380 (8th Cir. 2000) (internal quotations omitted)); *Snelling v. Stark Properties, Inc.*, No. 5:5CV46 DF, 2006 WL 2078562, at *12 (M.D. Ga. July 24, 2006) ("[T]he phrase 'serious health condition' is defined objectively, not subjectively.").  To raise a fact issue as to a "serious health condition" under the objective criteria of § 825.114(a), there must be record evidence that Williams suffered from a period of incapacity of more than three consecutive calendar days, and that he subsequently received treatment or had a period of incapacity in which he received treatment at least two times by a health care provider or obtained a regimen of continuing treatment under the supervision of a health care provider.  *See Murray*, 124 F.3d at 698.

Williams has not raised a fact issue as to whether he suffered from a serious health condition as defined by the FMLA.  The undisputed record evidence shows that Williams did not miss four or more consecutive days of work based on incapacity or inability to work.

31

Tyson's affidavit states that "Williams was not absent from work for three or more consecutive days, other than his scheduled vacation, from January 1, 2006 through his suspension on July 11, 2006."  (Docket Entry No. 54, Ex. A, Tyson Affidavit at ¶ 28). Williams's only absences between January 10, 2006 and July 11, 2006 were related to union activity, his DML, a scheduled vacation (6/04/06 to 06/18/06), and the one day Williams missed work due to "weather issues."  (*Id.*).  Williams testified that he did not miss work three consecutive work days because of his injury before he was fired.  (Docket Entry No. 54, Ex. D at 97:19–25).  The following exchange occurred in his deposition:

> Q:   There was never a time where you missed three consecutive days of work?
>
> A:   Correct.
>
> Q:   Unless it was vacation or personal time?
>
> A:   Right.  Not for injury.

(*Id.*, at 98:3–7).  Williams told the workers' compensation claims adjuster that the first full day of work he had to miss because of his leg injury was July 12, 2006, the day after he was suspended.  (Docket Entry No. 32, Ex. E).  The evidence in the record shows that Williams did not suffer from a "serious health condition," as objectively defined by the FMLA.  The motions for summary judgment filed by SWBT and Tyson on Williams's FMLA claims are granted.

### C.    The Workers' Compensation Retaliation Claim

Williams alleged that SWBT and Tyson terminated his employment in retaliation for filing a workers' compensation claim.  Williams argues that there is a causal link between his workers' compensation claim and his termination from SWBT because he was suspended only four days after filing his claim.  He contends that "close timing" is sufficient to make out a *prima facie* case of retaliation under the Texas Labor Code.  Tyson argues that the retaliation claims against him fail because the antiretaliation provision of the Texas Labor Code does not apply to individual supervisors.  (Docket Entry No. 30, at 23–24).  SWBT argues that Williams cannot establish a *prima facie* case of retaliation because he did not file his workers' compensation claim in good faith.  SWBT asserts that Williams's "multiple inconsistent representations about the date of injury . . . [and] about when and to whom he reported the alleged injury" are evidence that the claim was not filed in good faith.  (Docket Entry No. 54, at 19).  SWBT asserts that the lack of good faith is also shown by the fact that Williams "lost his worker's compensation claim at every stage."  (*Id.*).  SWBT also argues that the temporal proximity alone is insufficient to show a causal connection.  And SWBT argues that even if Williams has made a *prima facie* showing of retaliation under the Texas Labor Code, it has articulated a legitimate nondiscriminatory reason for his termination and Williams has not raised a fact issue as to  whether its reason was a pretext for retaliation.

Section 451.001 of the Texas Labor Code prohibits an employer from discharging or discriminating against an employee because that employee has filed a workers' compensation claim in good faith.  TEX. LAB. CODE ANN. § 451.001.  This section is "intended to apply

33

only to employees and employers who acted under the Texas Workers' Compensation Act."
*Texas Mexican Railway Co. v. Bouchet*, 963 S.W.2d 52 (Tex. 1998). The section only
permits suits against a subscribing employer and does not create a cause of action against an
individual supervisor. *Benners v. Blanks Color Imaging, Inc.*, 133 S.W.3d 364, 369 (Tex.
App.—Dallas 2004, no pet.); *Stewart v. Littlefield*, 982 S.W.2d 133, 136–37 (Tex.
App.—Houston [1st Dist.], 1998, no pet.). Tyson's motion for summary judgment on
Williams's workers' compensation retaliation claim is granted.

The elements of a *prima facie* case of retaliation under the workers' compensation act
are that: (1) the employee filed a claim for workers' compensation benefits in good faith; (2)
he suffered an adverse employment action; and (3) there is a causal link between the adverse
employment action and the filing of the workers' compensation claim. *Terry v. S. Floral Co.*,
927 S.W.2d 254, 257 (Tex. App.—Houston [1st Dist.] 1996, no writ); *Benners*, 133 S.W.3d
at 369. A fired employee need not demonstrate that the workers' compensation claim was
the sole reason for the job termination, but there must be evidence that the termination would
not have occurred when it did had the employee not filed the workers' compensation claim.
*Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005); *see also Burch v. City
of Nacogdoches*, 174 F.3d 615, 623 (5th Cir. 1999) ("To recover under this section, an
employee must show that the discharge would not have occurred when it did but for the
employee's assertion of a compensation claim."); *Continental Coffee Prods. Co. v. Cazarez*,
937 S.W.2d 444, 450 (Tex. 1996) ("A plaintiff does not have to prove that her discharge was

solely because of her workers' compensation claim.").  The causal link may be shown by direct or circumstantial evidence.  *Garcia v. Allen*, 28 S.W.3d 587, 600 (Tex. App.—Corpus Christi 2000, pet. denied).  Examples of circumstantial evidence that may support the causal link include: (1) knowledge of the claim by those making the decision to terminate; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false.  *See Continental Coffee Prods.*, 937 S.W.2d at 450.

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action.  *Garcia*, 28 S.W.3d at 600.  If the defendant makes this showing, the burden shifts back to the plaintiff to raise a fact issue as to the employer's retaliatory motive, by either direct or circumstantial evidence.  *Id.; Texas Division-Tranter*, *Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994) (per curiam).

Texas law does not require that an employee's claim be valid or successful to sue for workers' compensation retaliation.  *See White v. Goodyear Tire*, 96 F.3d 1444, 1996 WL 512054, at *4 (5th Cir. 1996) (per curiam) (holding that "§ 451.001 was intended to allow employees to recover from employer who retaliate against them for claims filed or instituted in good faith, even if those claims later turn out not to be compensable under the Act").  "[T]o file or institute a claim in good faith, an employee must have an objectively reasonable belief that she has a compensable injury under the Act."  *Id.* (citing *Gunn Chevrolet*, *Inc. v.*

*Hinerman*, 898 S.W.2d 817 (Tex. 1995) (holding that employee did not have a good faith claim for workers' compensation because her employer did not subscribe to the Act, employee had no reason to think that employer did, and employee never claimed that employer was responsible for her injury)).  The evidence as to when Williams was injured and when he told his employer about his injury is conflicting.  But there is evidence that Williams visited a doctor complaining of a leg injury and that the doctor restricted him from climbing ladders and told him to work light duty for a few weeks.  This court does not need to find that Williams did not file his claim in good faith because the evidence does show, however, that there is no basis for finding a causal link between Williams's application for workers' compensation benefits and SWBT's decision to fire him.

The fact that Tyson and SWBT were aware of Williams's workers' compensation claim when he was fired is insufficient.  "[A]n employer's knowledge of a workers' compensation claim standing alone is insufficient to raise a genuine issue of material fact." *Santillan v. Wal-Mart Stores, Inc.*, 203 S.W.3d 502, 507 (Tex. App.—El Paso 2006, pet. denied) (quotation omitted); *see also Garcia*, 28 S.W.3d at 601.  The employer's knowledge merely places the employee in the class protected by the statute. *Urquidi v. Phelps Dodge Refining Corp.*, 973 S.W.2d 400, 404 (Tex. App.—El Paso 1998, no pet.).  The fact that Williams filed his workers' compensation claim shortly before he was fired is not enough to raise a genuine issue of material fact. *Hernandez v. AT & T*, 198 S.W.3d 288, 294 (Tex.

App.—El Paso 2006, no pet.) (citing *Porterfield v. Galen Hosp. Corp.*, *Inc.*, 948 S.W.2d 916, 919–20 (Tex.App.—San Antonio 1997, pet. denied)).

Williams points to circumstantial evidence to support his *prima facie* case. He asserts that he was treated differently from similarly situated employees, that Tyson expressed a negative attitude about his injury, and that Tyson failed to follow company policies on workers' compensation claims. As evidence of disparate treatment, Williams asserts that a coworker, Kip Butler, was placed on light duty after he suffered a back injury. As evidence of Tyson's negative attitude, Williams points to an e-mail statement by Tyson to the worker's compensation claims adjuster that Williams "was suspended today for poor performance, so he will not have to worry about accommodation." (Docket Entry No. 59, Ex. K). As evidence that Tyson failed to follow SWBT policies, Williams asserts that he did not contact the disability group "immediately to initiate a workers' compensation claim for [his] employee's on-the-job-injury" and did not "[a]ccommodate job restrictions when reasonable." (Docket Entry No. 59, at 7).

The record shows that, as a matter of law, the evidence on which Williams relies is insufficient to support a *prima facie* showing of retaliation. First, the evidence makes it clear that Williams and Kip Butler were not similarly situated. They suffered from different injuries; Butler injured his back and Williams injured his leg, and there is no evidence as to relative severity or effect on work duties. *See Lone Star Steel Co. v. Hatten*, 104 S.W.3d 323, 330 (Tex. App.—Texarkana 2003, no pet.) (employees were not similarly situated then

their injuries differed;  both suffered from carpal tunnel syndrome but the plaintiff's injury was more severe, "showed no signs of improvement," and "needed surgery to correct the problem"); *Jones v. City of McKinney*, 1996 WL 682453, at *5 (Tex. App.—Dallas 1996, writ denied) (employees were not similarly situated when their back injuries differed in severity and effect on job duties).  There is no evidence of Butler's job duties.  Williams testified that Butler worked in a different office.  (Docket Entry No. 59, Ex. T at 140:1–6).  There is no basis to conclude that Williams and Butler were similarly situated for purposes of § 451.001.

Second, Tyson's statement is not evidence of a negative attitude about Williams's injury or his workers' compensation claim.  Tyson made the statement in response to the adjuster asking: "Is the employee currently working full time full duty or with restrictions? If with restrictions, what are they, for how long, and can the dept. accommodate them? I received today that the dr.'s office advised for the employee to follow the restriction of: no climbing ladders (light duty). Is the department able to accommodate this?"  (Docket Entry No. 32, Ex. K).  Tyson responded: "I told him that there would be no accommodation until they were recommended by your group.  Based on what he was telling me he was needing we could not accommodate anyways.  This employee was suspended today for poor work performance, so he will not have to worry about accommodation."  (*Id.*).  Tyson merely informed the claims adjuster that Williams was not currently working, either full-time or with restrictions, because he had been suspended for poor work performance.  The record does not

38

disclose any other potential negative expressions about workers' compensation or Williams's injury.  Williams acknowledged that Tyson "never made any kind of statements . . . like, there's no way we're going to have a disabled person working here," or "you're crippled, we don't want you," and "never said anything to [him] that made [him] think [Tyson] was discriminating."  (Docket Entry No. 54, Ex. D at 121:17–23; 122:6–9).

Finally, the evidence does not support an inference that Tyson failed to follow SWBT's workers' compensation policies.  Tyson testified that he did not submit a worker's compensation claim for Williams before July 5, 2006 on the assumption that it "had been taken care of" because it occurred before he became Williams's supervisor.  (Docket Entry No. 59, Ex. A at 86:12–16).  It is undisputed that, in response to Williams's July 4, 2006 e-mail, Tyson directed Williams to the appropriate group for handling his worker's compensation claim.  (Docket Entry No. 59, Ex. C).  And Tyson testified in the workers' compensation proceeding that he forwarded Williams's e-mail and attachments to the SWBT disability group.  (Docket Entry No. 59, Ex. A at 86:1–5).

The record evidence also precludes Williams from making a *prima facie* showing of a causal connection between his application for workers' compensation benefits and the decision to fire him.  The record evidence shows that Williams had been the subject of progressive discipline for poor work performance beginning before his injury.  The evidence also shows that right before Williams was fired, he violated work place rules and policies and left an entire school district without telephone service for an entire day.  Under the

progressive discipline terms, that provided a clear basis for job termination.  Even assuming that Williams had made a *prima facie* showing of a causal link between his workers' compensation claim and his job termination, SWBT has articulated a legitimate reason for his job termination, and Williams has failed to raise a fact issue as to pretext or as to whether retaliation played any role in the decision.

SWBT fired Williams for his continued poor performance, which dated back to October 2005, and for violating the terms of his June 27, 2006 DML.  The fact that an employee has filed a workers' compensation claim does not immunize that employee from being fired for poor performance, misconduct, or similar reasons.  Courts have held that employers have legitimate grounds to fire an employee who had filed a workers' compensation claim when the employee has a history of unexcused absences; can no longer perform the essential functions of the job; violates the employer's absence-control policy; was insubordinate; or has an unsatisfactory safety record and fails to meet the employer's safety standards.  *See*, *e.g.*, *Hernandez*, 198 S.W.3d at 292–93 (history of unexcused absences); *West v. Maint. Tool & Supply Co.*, 89 S.W.3d 96, 106 (Tex. App.—Corpus Christi 2002, no pet.) (employee could not perform essential job functions); *Carrozza*, 876 S.W.2d at 313 (absence-control policy); *Terry v. S. Floral Co.*, 927 S.W.2d at 258 (absence-control policy); *Castor v. Laredo Cmty. College*, 963 S.W.2d 783, 785 (Tex. App.—San Antonio 1998, no pet.) (insubordination); *Gutierrez v. Contract Freighters*, *Inc.*, 2006 WL 1328099, at *3 (Tex. App.—San Antonio 2006, no pet.) (unsatisfactory safety record).

The evidence in the record does not raise a fact issue material to determining whether SWBT's reason for terminating Williams is a pretext for retaliation. The evidence shows that Williams had long-standing performance problems, beginning before any injury. He had been given multiple opportunities to improve those problems for more than six months but failed to do so. He continued to receive warnings and escalating disciplinary measures under the progressive discipline program, culminating in the July 10, 2006 incident. Viewing the evidence in the light most favorable to Williams, even if he made his worker's compensation claim on March 23, 2006, the performance problems and discipline began well before that date. Williams had at least two different supervisors who disciplined him for the same types of misconduct and performance problems, both before and after his workers' compensation claim. Given Williams's performance and disciplinary history and the repeated warnings that he would lose his job if his performance did not improve, there is no basis to conclude that SWBT decided to terminate Williams's employment in retaliation for his filing a workers' compensation claim.

SWBT's motion for summary judgment on Williams's workers' compensation retaliation claim is granted.

## D.    The *Weingarten* Claim

Williams alleged that SWBT violated his *Weingarten* rights because he was called in for a June 27, 2006 disciplinary interview with "Union and Management representatives" and did not have an investigatory interview. (Civ. A. No. 08-0968, Docket Entry No. 1).

According to Williams, "Management claims to have started the investigatory interview at 3:00 PM on June 27, 2006 and ending at 3:30 PM the same day the disciplinary interview started at 3:30 PM and ended at 4:00 PM.  This is certainly not enough time to consider the information gathered in the investigatory interview. . . .  Management had already made up there [sic] mind to terminate Plaintiff."  (Docket Entry No. 59, at 20); (*see also id,* Ex. W). SWBT did not move for summary judgment on this claim.  But because Williams is proceeding *in forma pauperis*, his complaint is subject to screening under 28 U.S.C. § 1915. Under § 1915(e)(2)(B), the court may dismiss any part of the complaint that fails to state a claim upon which relief may be granted.  *Bui Phu Xuan v. Fort Worth Star Telegram*, 277 Fed. App'x 452, 453 (5th Cir. 2008).

The rights afforded under *Weingarten* do not extend as far as Williams asserts. *Weingarten* entitles a union employee to have a union representative present at an investigatory meeting if the employee believes that there might be disciplinary action.  *Nat'l Labor Relations Bd. v. J. Weingarten, Inc.*, 420 U.S. 251, 262 (1975).  "The representative is present to assist the employee, and may attempt to clarify the facts or suggest other employees who may have knowledge of them." *Id.* at 260.  *Weingarten* does not require employers to deliberate for a certain time after an investigatory meeting before taking disciplinary action.  In fact, "exercise of the [*Weingarten*] right may not interfere with legitimate employer prerogatives." *Id.* at 259.  The court explained:

> The employer may, if it wishes, advise the employee that it will
> not proceed with the interview unless the employee is willing to

42

> enter the interview unaccompanied by his representative. The
> employee may then refrain from participating in the interview,
> thereby protecting his right to representation, but at the same
> time relinquishing any benefit which might be derived from the
> interview. The employer would then be free to act on the basis
> of information obtained from other sources.

*Id.* Moreover, an employee has no *Weingarten* right to union representation at a meeting "conducted solely to inform the employee of, and acting upon, a predetermined disciplinary decision." *Anchortank, Inc. v. NLRB*, 618 F.2d 1153, 1168 (5th Cir.1980).

*Weingarten* is violated if an employer allows a union steward to attend an investigatory interview but requires the steward to remain silent. *NLRB v. Texaco*, *Inc.*, 659 F.2d 124, 126–27 (9th Cir. 1981). The employer may, however, "achieve an orderly interview by hearing the employee's account first and leaving to the end of the meeting the representative's 'additions and clarifications.'" *N.L.R.B. v. Southwestern Bell Telephone Co.*, 730 F.2d 166, 172 (5th Cir. 1984) (citing *Southwestern Bell Telephone Co. v. NLRB*, 667 F.2d 470, 473-74 (5th Cir.1983)).

In his amended complaint, Williams alleged that a CWA representative was present at the June 27, 2006 meeting. To the extent that Williams alleged that SWBT violated his *Weingarten* rights because management had already "made up its mind" before the meeting, he fails to state a claim that his *Weingarten* rights were violated. To the extent that Williams alleged that SWBT did not take sufficient time to allow him to present information in an investigatory interview before making a disciplinary decision, he also fails to state a claim of any violation of *Weingarten* rights. *Weingarten* is not violated merely because an

43

employer made a disciplinary decision before, during, or shortly after an employee interview. Williams has already amended his complaint and has presented extensive evidence, none of which supports any claim of a violation of *Weingarten* rights.  Williams's claim that SWBT violated his *Weingarten* rights is dismissed.

### E.    The Labor Management Relations Act Claims

Williams alleged that SWBT breached the CBA by firing him in violation of the nondiscrimination provision in the CBA and by failing to submit the issue of his suspension or termination to arbitration.   Williams alleged that CWA breached its duty of fair representation by deciding not to arbitrate his grievance.  He argues that CWA treated his case in a "perfunctory manner" because it did not raise the ADA, FMLA, and workers' compensation issues at the "Division and General levels of the grievance process."  (Docket Entry No. 59, at 19).  Williams alleged that CWA acted in bad faith by not including these issues in the initial grievance form or "anything that would alert the Company of the issues involved."  (*Id.*).

SWBT moves for summary judgment on Williams's claim for breach of the CBA. SWBT contends that Williams is bound by the result of the grievance procedure unless he can show that CWA breached its duty of fair representation.  SWBT contends that no such showing can be made in this case and that there is no evidence that CWA acted arbitrarily or in bad faith.  CWA moves for summary judgment on the breach of duty claim, arguing that the evidence shows that as a matter of law, it fulfilled its duty of fair representation.  CWA

notes that it initiated a grievance on Williams's behalf, investigated his grievance, gave him an opportunity to demonstrate that SWBT lacked just cause to fire him, and concluded that it would not likely prevail in arbitration because of Williams's extensive disciplinary record and performance problems.  CWA argues that it had a good faith basis for its actions and its decision was well within the range of discretion afforded to the Union.

An employee's claim under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), for breach of a collective bargaining agreement and a violation of the duty of fair representation, comprises two distinct causes of action.  One is against the employer and one is against the union.  Section 301 provides an employee with a federal cause of action against his employer for breach of the collective bargaining agreement.  The cause of action against the union for breach of the duty of fair representation is implied under the National Labor Relations Act.  *DelCostello v. Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).  The two causes of action are "inextricably interdependent" and together are a hybrid § 301 duty-of-fair-representation suit.  *United Parcel Service*, *Inc. v. Mitchell*, 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981).

If the arbitration and grievance procedure is the exclusive and final remedy for breach of the collective bargaining agreement, the employee may not sue his employer under § 301 until he has exhausted the procedure.  *Thomas v. LTV Corp.*, 39 F.3d 611, 621–22 (5th Cir. 1994).  The employee is bound by the procedure's result unless he shows that the union breached its duty of fair representation.  *Hines v. Anchor Motor Freight*, *Inc.*, 424 U.S. 554,

96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).  A breach of the duty of fair representation is an "indispensable predicate" for a § 301 claim.  *Thomas*, 39 F.3d at 621–22.  A hybrid § 301 suit is essentially brought to set aside "a final and binding determination of a grievance, arrived at through the collectively bargained method of resolving the grievance." *Mitchell*, 451 U.S. at 67.

The union's duty of fair representation stands "as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The union, however, retains considerable discretion in processing the grievances of its members.  *Cox v. C.H. Masland & Sons*, 607 F.2d 138, 142 (5th Cir. 1979). An employee does not have an absolute right to have his grievance taken to arbitration or to any other level of the grievance process.  *Vaca*, 386 U.S. at 191.  A breach of the duty of fair representation instead occurs "only when the union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."  *Stalcup v. Comm'n Workers of America*, 44 Fed. App'x 654, 654 n.3 (5th Cir. 2002) (quoting *Vaca*, 386 U.S. at 190).

A union may not "arbitrarily ignore a meritorious grievance or process it in perfunctory fashion."  *Vaca*, 386 U.S. at 191.  The duty of fair representation imposes an obligation for a union to investigate a grievance in good faith and to prosecute "with reasonable diligence unless it decided in good faith that the grievance lacked merit or for some other reason should not be pursued."  *Hammons v. Adams*, 783 F.2d 597, 602 (5th Cir.

1986).  A union does not breach its duty of fair representation if it fails to pursue a grievance through simple negligence or a mistake in judgment.  *Vaca*, 386 U.S. at 192-93.  The critical question is whether a union's conduct was arbitrary, discriminatory, or in bad faith, so that it undermined the fairness or integrity of the grievance process.  *Hines*, 424 U.S. at 567-69.

The CBA between SWBT and CWA is bifurcated into two agreements, the Departmental Agreement and the Agreement of General Application.  (Docket Entry No. 58, Ex. B, Affidavit of Ed Pinkelman, at ¶ 5).  The CBA does not limit the subject matter of a grievance, which can be any employee complaint.  (*Id.*, at ¶ 6).  But the CBA does limit the subjects that can be arbitrated.  The permissible subjects are: the meaning of a provision in the Departmental Agreement; the application of a provision in the Departmental Agreement to an employee; the dismissal for just cause of an employee with more than one year of service; the disciplinary suspension for just cause of an employee with more than a year of service; and the demotion of an employee with more than one year of service.  (*Id.*).

The evidence is undisputed that CWA decided to present Williams's grievance as a termination without just cause.  After reviewing Williams's claims, CWA decided not to present his federal and state law claims in the grievance because it determined that Williams's injury did not qualify for protection under the ADA or the FMLA and that his worker's compensation claim was nothing more than a "conclusory allegation."  (Docket Entry No. 58, at 20).  CWA also decided not to present Williams's discrimination claims in the grievance because the nondiscrimination article in the CBA is not subject to arbitration.

47

That article, Article IX of the Agreement of General Application, is not part of the Departmental Agreement and is not subject to arbitration.  CWA had previously attempted to arbitrate a dispute under Article IX of the Agreement of General Application, titled "Nondiscrimination," and lost.  The arbitrator held that Article IX is not subject to arbitration under the CBA.  (Docket Entry No. 58, Ex. B-2).  With respect to Williams's grievance that he was terminated without just cause, CWA decided not to pursue the claim to arbitration after the grievance was denied because, based on its review of Williams's file, CWA determined that it would not likely prevail in arbitration based on Williams's discipline history and performance problems.  (Docket Entry No. 58, at 18).

Based on the record evidence, there is no basis to conclude that CWA's actions in handling Williams's grievance were arbitrary, discriminatory, or in bad faith.  CWA considered all of the evidence before it and made a reasonable decision that Williams's discrimination claims did not have sufficient merit to be included in the initial grievance to SWBT.  CWA also considered all of the evidence and the outcome of the grievance and made a reasonable decision, based on Williams's history of disciplinary and performance problems, that these claims would not likely prevail in arbitration.  A union violates the duty of fair representation "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Airline Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991) (quotation omitted).  A union's decision or strategy on how to present a grievance does not give rise to a breach

of the duty of fair representation unless it is arbitrary or irrational.  *Patterson v. Int'l Brotherhood of Teamsters, Local 959*, 121 F.3d 1345, 1349–50 (9th Cir. 1997).  CWA's decisions do not constitute a breach of the duty of fair representation because they were not "so far outside a wide range of reasonableness as to be irrational."  There is no evidence of bad faith or discrimination in the handling of Williams's grievance.

Because CWA is entitled to judgment as a matter of law that it did not breach its duty of fair representation, Williams has failed to establish the "indispensable predicate" for his hybrid claim against SWBT.  Summary judgment is granted as to the claims based on § 301 of the Labor Management Relations Act.

## IV.    Conclusion

This court grants the defendants's motions for summary judgment.  Williams's *Weingarten* claim is dismissed.  Final judgment is entered by separate order.

SIGNED on April 6, 2009, at Houston, Texas.

Lee H. Rosenthal

United States District Judge